## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| M.B., a minor, by his parents and next friends, J.B. and S.B. | |
| and | |
| J.B. and S.B. | |
|      Plaintiffs, | |
|      v. | |
| FAIRFAX COUNTY SCHOOL BOARD, 10700 Page Avenue, Fairfax, Virginia 22030, | **Civil Action No. 22-cv-930** |
|      Defendant. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.    This is an action brought by J.B. and SB. ("the parents"), in their own right and on behalf of their son, M.B., alleging that the Fairfax County Public Schools (operated by the School Board), failed to provide M.B. with the free appropriate public education ("FAPE"), to which he is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 *et seq.* Fairfax County Public Schools ("FCPS" or "school system"), denied M.B. a FAPE when it failed to propose an appropriate Individualized Education Program ("IEP"), and placement for him for the 2019-2020, 2020-2021, and 2021-2022 school years.  The Hearing Officer who decided the administrative appeal compounded these violations when she ignored the parents' compelling evidence and witnesses, misapplied Supreme Court law, and denied the requested relief.  In doing so, the Hearing Officer excused defendant's failure to adhere to applicable regulations governing special education and the provision of FAPE by denying the

1

parents their requested relief of reimbursement, as well as funding and placement at the Phillips School.  Due to any of these errors, the Court should reverse the Hearing Officer's Decision.

## Jurisdiction

2.      This Court has jurisdiction pursuant to the IDEA, 20 U.S.C. §§ 1400-1461; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794;  42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. This Court has pendent jurisdiction pursuant to VA. CODE ANN. § 22.1-213 *et seq*., (2003).

3.      Plaintiffs have exhausted their administrative remedies and seek to reverse the order of a Hearing Officer of the Virginia Department of Education, Division of Compliance, dated May 17, 2022.

## Parties

4.      M.B. is a fifteen-year-old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia.  His parents, J.B. and S.B., bring this action on M.B.'s behalf and in their own right.

5.      The Fairfax County Public Schools is a municipal corporation receiving federal funds under the IDEA.  20 U.S.C. §§ 1400 *et se*.  FCPS is responsible for complying with federal law with respect to the provision of a FAPE to each educationally disabled child in Fairfax County.

## Factual Allegations

6.      During the 2012-2013 school year, M.B. attended St. John Academy for Kindergarten.

7.      During the summer of 2013, his parents referred him to FCPS Child Find due to concerns with academics and behaviors.  In July 2013, FCPS found M.B. elgiibile for special education and related services under the category of Other Health Impairment ("OHI") due to a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

8.      M.B. repeated Kindergarten at Sleepy Hollow Elementary School, within FCPS.

9.      For first and part of second grade, M.B. attended a private school for students with learning differences where he experienced a small student-to-teacher ratio.  M.B. was subsequently home-schooled while a new medication protocol was developed to treat his ADHD and sleep disorders.

10.     In August 2018, M.B.'s parents enrolled him in FCPS at Sunrise Valley Elementary School as a fifth-grade student and requested his IEP be implemented.

11.     The IEP team met on August 21, 2018, and assessments were recommended in order to update the IEP.  The team determined the interim hours of special education services would be as follows:  14.5 hours weekly of specialized instruction inside the general education setting and 15 hours weekly of specialized instruction outside of the geneal education setting. Additionally, the IEP provided weekly Speech and Language services.

12.     At the IEP meeting, the team recommended assessments and the parents provided consent.

13.     At the meeting, the parents requested that the IEP team consider placement at a specific FCPS special education proram called a Comprehensive Service Site ("CSS"), but the school-based team would not consider this placement for M.B.

3

14.     In August and September 2018, FCPS administered an educational evaluation. On the Kaufman Test of Educational Achievement (KTEA-3), M.B.'s composite scores were as follows: Reading 69, 2nd percentile (Low); Math 77, 6th percentile (Below Average); Written Language 55, 0.1st percentile (Low); Sound Symbol 80, 9th percentile (Below Average); Reading Fluency 70, 2nd percentile (Below Average); Oral Fluency 90, 25th percentile (Average); Orthographic Processing 70, 2nd percentile (Below Average). M.B.'s Orthographic Processing subtest scores demonstrated a high degree of discrepancies with Spelling 46, <0.1st percentile (Very Low); Letter Naming Fluency 103, 58th percentile (Average); Word Recognition Fluency 71, 3rd percentile (Below Average).

15.     On the Fountas and Pinnell BAS Level L, (middle second grade) text, M.B. had 96% accuracy. The evaluator incorrectly identified this level of accuracy as "passing," when it was "instructional". M.B. scored a 3/9 on comprehension which was not proficient. His reading rate was 85 words per minute (WPM). At grade level, M.B. should have been reading at 140-180 WPM.

16.     The September 2018, Speech and Language Evaluation Report summarized that "M.B. continues to exhibit an oral language disorder characterized by difficulty with understanding and using oral language. Such problems may have a direct impact on M.B.'s performance in the classroom especially with processing new information and communicating learned knowledge, as well as participating appropriately in social interactions."

17.     On the Clinical Evaluation of Language Fundamentals, Fifth Edition (CELF-5) M.B.'s results were as follows: Core Language Score 81, 10th percentile; Word Classes 4, 2nd percentile; Formulated Sentences 10, 50th percentile; Recalling Sentences 5, 5th percentile; and Semantic Relationships 8, 25th percentile. Additionally, informal observations revealed that M.B. had weaknesses with using pragmatic language.

4

18.     On September 26, and October 3 and 4, 2018, FCPS completed a Psychological evaluation. During testing, the evaluator observed, "M.B. began each new test readily and expressed enthusiasm for the easier items; however, as the tasks increased in difficulty, he became frustrated and very upset when he did not know an answer. His body became tense and his face grew red from his effort and frustration. After he was unable to complete several tasks in a row, he began to refuse further participation in testing." The evaluator noted that "The following results are considered a valid representation of his current cognitive functioning; however, they may be a slight underestimate of his full potential, due to the observed behaviors."

19.      On the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), M.B.'s results were as follows: Verbal Comprehension Index 73 (Very Low); Visual Spatial Index 69 (Extremely Low); Fluid Reasoning Index 94 (Average); Working Memory Index 65 (Extremely Low); Processing Speed Index 63 (Extremely Low); Full Scale IQ Score 70 (Very Low).

20.     On the Developmental Test of Visual Motor Integration ("VMI"), M.B. scored an 85 (Below Average).

21.     On the Behavior Assessment for Children, Third Edition ("BASC-3"), S.B., Ms. Hansen (teacher), and M.B.'s self-rating indicated clinically significant scores for Hyperactivity and Attention problems. M.B.'s self-report revealed significant difficulty in the area of emotional functioning. Ms. Hansen rated M.B.'s Functional Communication skills in the clinically significant range as well as for Learning Problems and Study Skills scales.

22.     In October and November 2018, an Occupational Therapist ("OT") observed M.B. and recommended the following: use of visuals for spacing; encourage skipping lines when writing

on notebook paper; encourage use of both hands when typing; typing games; use of stool; and gentle verbal or visual reminders to use his left arm.

23.     On November 28, 2018, an observation was conducted during M.B.'s reading class. The observer assessed M.B.'s performance as Poor (3) in the following categories: is attentive; begins work promptly; persists through difficult tasks; works independently; and asks appropriate questions. His performance was Fair (2) in the following categories: follows classroom rules, responds to redirection, follows oral direction, finishes classwork on time; and participates meaningfully in class discussions. He was marked as Good (1) in one area only:  interacts appropriately with teacher. The observer summarized, "There were no other students in the activity, but if compared to a typical peer, M.B. was cheerful and very positive until being given a direction he really did not want to follow.  He did quickly take redirection and teacher decision, but M.B. has been observed to refuse to work when there is a sub or less familiar person. M.B. gets distracted and off-topic frequently and requires regular redirection, which he takes without complaint and often apologizes."

24.     In October 2018, FCPS administered a Cognitive Abilities Test (CogAT). M.B.'s scores were as follows: Verbal- number correct 19, (age percentile rank 3rd and grade percentile rank 5th) and Quantitative- number correct 12 (age percentile rank 6th and grade percentile rank 8th).

25.     On December 6, 2018, the IEP team convened and found M.B. eligible for spcial education under the codes of OHI and Specific Learning Disability ("SLD").  The team reviewed and revised goals in the areas of Work Completion, Cognitive/Attention, Communication, Decoding, Comprehension, Writing and Mathematics. The FCPS team agreed to complete an informal evaluation to assess M.B.'s phonics and phonics related skills.  An assistive technology

consultation was also agreed to. The FCPS team agreed to collaborate with the OT, regarding M.B.'s struggle with fatigue during the afternoon and regarding self-regulation.

26.    The IEP dated January 4, 2019, documented M.B.'s present levels in reading as follows: Fountas & Pinnell BAS Level L (middle 2nd grade level text) with 96% accuracy, which is an instructional reading level, and his comprehension was not proficient.

27.    The IEP dated January 4, 2019, documented writing as the area in which M.B. struggled the most.  On the Developmental Spelling Assessment (DSA) he was identified as performing at the Letter Name stage with a score of 22, showed mastery of short vowel and consonant sounds in single syllable words.  On the DSA Within Word stage, M.B. had a score of 6 with the notation that he struggled with all of the patterns including vowel teams, complex consonants, abstract vowels, and R-controlled vowels.

28.    The IEP dated January 4, 2019 documented areas of need in math, and listed computations as M.B.'s greatest deficit.  The present levels noted that he was unable to solve subtraction problems that require regrouping and was unable to complete multiplication and division problems. M.B. also displayed weaknesses with problems involving time, money, fractions, number sense, decimals, and word problems.

29.    The January 4, 2019 IEP team set goals and objectives in the areas of Cognitive/Attention, Communication, Reading, Writing, Mathematics, and Social Skills. For services, the IEP provided M.B. with seven hours per week of speclaizied instructin in the general education setting and thirteen hours per week of speclizied instruction outside of the general education setting. For Speech and Language, the IEP provided for one hour per month of service

in the genereal education setting and one hour per month of service out of the general education setting.

30.     In May of 2019, M.B. engaged in behaviors including making noises, growling and he locked his teacher out of the classroom.  M.B. was assigned to write an apology letter and serve lunch detention.

31.     During sixth grade, M.B.'s behaviors continued to escalate in school. During that school year, M.B. was isolated from his non-disabled peers for all classes except for gym and music. M.B. reported to his general education classroom for homeroom only and spent the remainder of his day in the multiple disabilities classroom.

32.     The multiple disabilities classroom was limited to approximately three other students whose disabilities were intellectual and behavioral in nature, and were also significantly younger than M.B. As a result. M.B.'s behavior difficulties continued to escalate.

33.     On October 15, 2019, the IEP team convened to discuss a Functional Behavior Assessment ("FBA"). The school-based team determined that the data did not indicate the need for a formal Behavioral Intervention Plan ("BIP"), despite the parents' concerns with M.B.'s behaviors.  The meeting notes document that "The family shared that they are concerned this data does not represent M.B.'s challenges, especially given his small group setting, with low teacher-student ratio (2-5 students). The family shared that after long breaks  from school, M.B.'s behavior has historically increased. The FCPS team shared that they have seen improvement since the beginning of the year. He has responded well to the current token system. He earns preferred activity time for being on task. The FCPS team has shared that he has made progress on his IEP goals, however the team will create a new data sheet, which will capture the positive reinforcement

system and components (i.e. prompting) of work completion goal indicate on the current IEP. The team will continue to monitor M.B.'s behavior and will reconvene to address any concerns." The family subsequently disagreed with this FBA.

34.     The family later learned, at the due process hearing, that M.B.'s teacher had no certification or training as a behavior specialist and was, at times, instructing the class while attempting to collect beahvioral data for the FBA.

35.     Based on the parents' concerns with lack of progress, the school team proposed to update educational testing. The team also noted that Transmath was being utilized for M.B.'s math intervention.

36.     On November 12, 2019, FCPS secluded M.B. after he acted out in math class. The incident documentation included that "M.B. was upset and antagonized/ provoked an altercation with another student and displayed other dangerous behaviors such as picking up a chair and threatening to throw it. M.B. did not want to do math and began to act out including hitting, threatening throwing a chair, damaging school property."

37.     On November 19, 2019, the IEP team convened to review evaluations and discuss behavior concerns. The meeting notes document that, "The team has observed avoidance behaviors, when given an unpreferred task. The team will continue to monitor, as this as behavior has resulted in some aggression (throwing, knocking off items)." Despite the recent seclusion incident, a BIP was still not recommended. The meeting notes indicate that "M.B. is instructional on an N reading level (early-third grade). The family is concerned that there has not been significant growth and they are concerned M.B. (sic) is three levels below grade level."

38.     On November 30, 2019, M.B.'s parents pursued private reading and mathematics assessments which revealed global reading and math delays and identified M.B. as having Dyslexia and Dyscalculia. On the Feifer Assessment of Reading (FAR), M.B.'s index scores were as follows: Phonological Index 60, 0.4th percentile (Markedly Deficient); Fluency Index 50, <0.1st percentile (Markedly Deficient); Mixed Index 52, 0.1st percentile (Markedly Deficient); Comprehension Index 60, 0.4th percentile (Markedly Deficient); and FAR Total Index 50, <0.1st percentile (Markedly Deficient). On the Feifer Assessment of Mathematics (FAM), M.B.'s index scores were as follows: Procedural Index 75, 5th percentile (Deficient); Verbal Index 75, 5th percentile (Deficient); Semantic Index 74, 4th percentile (Deficient); and FAM Total Index 71, 3rd percentile (Deficient).

39.     The private evaluator summarized that in reading, "There is evidence of global reading delays and Dyslexia. His overall reading skills are measured below the 1st percentile… M.B. has the potential to improve his significant reading skill impairments but requires a comprehensive special education reading intervention such as the Wilson Reading System to make adequate progress and access the curriculum. The providers for the evidence-based reading intervention need to be fully certified and trained for Dyslexia."

40.     The private evaluator summarized that in math, "There is evidence of global math delays and Dyscalculia. His overall math skills are measured at the 4th percentile… He requires a multi-sensory research-based math program with daily progress monitoring to adequately access the curriculum and learn."

41.     The IEP team convened on January 31, 2020, for M.B.'s annual review. The meeting notes include the following: "The family requested to review his mastery tests to determine if he has been making progress on previous level. Previous mastery tests show M.B. did

not meet all the benchmarks on Mastery Level tests. The FCPS team recommends going back and look at the previous level tests, score ungraded tests and re-teach until mastery. The FCPS team will also give the placement test to determine appropriate level. The FCPS team also proposed additional coaching sessions for staff implementing this program, this will be in collaboration with FCPS Office of Instruction."

42.     In the January 31, 2020 IEP meeting, the family requested that FCPS consider a CSS program for M.B. in middle school and the school did not agree. The IEP set forth that M.B. would receive one (1) hour per week of specialized instruction in the general education setting weekly, nineteen (19) hours per week of specialized instructin out of the general education setting, and two (2) hours per month of Speech and Language therapy out of the general education setting.

43.     In January and February 2020, M.B.'s behaviors continued to escalate, including eloping from class, avoidance behaviors, and difficulty transitioning.

44.     On February 24 and 25, 2020, M.B. was suspended from school for behaviors including:  refusal to follow classroom directions and instructions, interfering with learning in the classroom, grabbing a staff member, eloping from the school building, attempting to hit another student with his recorder, minor insubordination, elbowing a staff member, throwing school materials, and kicking an administrator.

45.     On March 9, 2020, the IEP team decided to start collecting data for another FBA.

46.     On March 13, 2020, schools closed due to the COVID-19 pandemic.

47.     On April 16, 2020, FCPS sent an email to families regarding distance learning stating, "FCPS has been working hard to implement a distance learning environment this week. During these unprecedented times when face to face instruction is not an option, we are continually

11

looking to maximize efforts to engage and support students receiving special education services. Individualized Education Programs (IEPs) FCPS will be implementing for students with IEPs a Temporary Learning Plan (TLP) that will outline special education and related services during the school closure. Special education case managers, in collaboration with related services providers, will consult with, and gather input from parents about the TLP for each student which will outline the prioritized goals, accommodations and services that will be addressed during the school closure. The TLP is a letter that will identify the continuity of learning services that will be provided to students between now and the end of the school year. This week, FCPS provided training for school staff on how to draft and implement the TLP. While the expectation is that plans are completed by school staff by the end of April, there is recognition that flexibility in the timeline is needed due to individual family circumstances."

48.     On April 15, 2020, the IEP team reconvened.  The school team shared that in the weeks prior to closure, M.B.'s behavior was impacting his progress at a *"more significant level."* When data was requested, the school team shared that they did not have access to all the reading data including reading rate because the test protocols were at school.  They agreed to update the IEP to include this data once schools reopened.

49.     At the April 15, 2020 IEP meeting, the parents again raised their concerns about M.B.'s behaviors and learning and requested consideration of a comprehensive school placement. The notes documented that, "The FCPS team shared a concern regarding the numbers of goals in conjunction with the behavior concerns and the limited progress he made last school year." The school-based team discussed the CSS within Herndon Middle School. Because M.B. required significant adult support throughout the day, the parents expressed their concern about the size of the classes as well as several transitions that would be required throughout the day. The notes

documented that, "Currently, M.B. is in a classroom with a small teacher/ student ratio. However, even within this small ratio, behaviors have impacted his progress. The parent shared they have concerns regarding the size of Hughes and Herndon. M.B. requires significant adult support throughout his day. The school team shared that transitions can be difficult for M.B. Specials have also been a time where the school team has seen an increase in behavior."

50.     The IEP team concluded that it would reconvene to complete the proposal. The IEP team also notified the parents that it would like to include representatives from the Burke Center, the FCPS public day separate school, at the next meeting, in further discussions of placement.

51.     The team then developed M.B.'s temporary learning plan (TLP) for the remainder of the school year was to address only four goals in distance learning (out of fifteen goals on the IEP). M.B. was to receive 120 minutes daily of "services" for Math and Language Arts (60 minutes each) which could include anything from "telephone contact, emails, pre-recorded videos, and videoconferencing sessions."

52.     This TLP in no way provided for M.B. to receive a FAPE.

53.     On May 26, 2020, the IEP team reconvened. The IEP contained several erroneous statements including that M.B. was on an Instructional level N with 97% accuracy and 4/9 on comprehension. With those scores, M.B.'s reading at a level N should have been considered Hard, not Instructional.  This would indicate that M.B. was possibly an instructional level M. The IEP later stated that M.B. was on an Instructional level O which was also incorrect and had no support in the data.

54.     The IEP included that M.B. passed two Corrective Reading Mastery Tests; however, it had been discussed in previous IEP meetings that the teacher failed to administer the mastery tests.

55.     At the May 26, 2020 IEP meeting, the parent shared that M.B. required a small group setting for his academic and behavioral needs. Staff from the Burke Center attended the meeting and described the level of support they offer students.

56.     Burke enrolls students from Kindergarten to 8th grade and implemented a similar academic schedule as Hughes and Herndon CSS. In regard to the reading programs offered, staff shared that the same supports are available.  Dr. Sweet, Assistant Principal of Special Education at Burke, indicated that M.B.'s behaviors were not as severe as those demonstrated by other students at Burke.

57.     Because the academic offerings were similar, and M.B.'s behaviors less severe and relatively infrequent, Dr. Sweet recommended that M.B. attend Herndon CSS.

58.     The family asked FCPS to consider private placement based on concerns regarding both Burke and CSS's ability to meet M.B.'s academic and behavioral needs.  The meeting notes documented the FCPS refusal to refer to private, and the response, "FCPS shared that M.B. has only received base school level of services. Both CSS and Burke would give a higher level of support than offered at Sunrise Valley or Hughes Middle School. The FCPS team does not believe all options have been exhausted in FCPS."

59.     The FCPS decision-making rationale was not based on M.B.'s unique needs but rather administrative decision making.

60.    A draft FBA was started prior to the school closures but was not completed.  The meeting notes also documented that, "The FCPS team proposes ESY class- based services. The FCPS team proposes 2 hours a week of services, during the ESY session. The family shared that they do not believe distance learning is effective in addressing M.B.'s academic and social emotional needs. They believe he needs direct person to person instruction. As that is not available, they would like M.B. to participate in distance learning ESY, but ask their concerns to be documented."

61.    The school-based team determined that placement would be in CSS at Herndon Middle School despite the parents' disagreement.

62.    S.B. returned the IEP consent form indicating she did not give consent for the IEP to be implemented.  A subsequent letter from counsel outlined the following related to the disagreement: "My clients are not in agreement with M.B.'s placement in the Comprehensive Services Site (CSS) but are consenting to the IEP in order to allow services to be provided. Numerous concerns were discussed in IEP meetings throughout this year regarding the implementation of M.B.'s interventions. Due to these concerns, please consider this a request for copies of all Corrective Reading mastery tests and any other data collected as part of his reading interventions. There were also discrepancies in the school's behavioral data; therefore, please also consider this a request for all data collected regarding M.B.'s behaviors including data tracking forms."

63.    M.B. began seventh grade in the CSS program at Herndon Middle School.  School resumed in a virtual format and remained virtual until March 2021, when he went back to in person learning four days a week.

64.     On November 12, 2020, S.B. received an email from M.B.'s teacher, Mr. Kenski, regarding M.B.'s math assessment scores. Mr. Kenski wrote, "On 10/7/20 M.B. scored a 790 on his PAM baseline assessment (11 answers out of 30); On 10/28/20 M.B. scored a 92% on his Unit 1 quiz (12 answers out of 13); M.B. also scored a 100% on his online VMATH Module 1 Test."

65.     The three other students in M.B.'s math class were on the Autism Spectrum and not appropriate peers. This was the only math class offering Transmath available to M.B. at the school.

66.     In December 2020, S.B. asked for clarification on M.B.'s grades.  She received the following explanation, "The English 7 team is grading this assessment out of 20 points. Each student starts out with 10/20 (per FCPS 50% grading policy) and then the earned points from the assessment are added in. So, for M.B., his score in the grade book will be a 17/20 (85%). I'll explain this to him during 4th tomorrow and then we can decide if he wants to do a retake from there." Stated otherwise, the score of a 17/20 was provided even though M.B. only scored a 7/20 on the assignment.

67.     An April 14, 2021, email from S.B. to school staff documented the following difficulties M.B. experienced with school,  "I have tried several times to update the contact information for the teachers via the blackboard and SIS system. Despite my efforts, the teachers cannot seem to access our current information. When M.B. is having difficulty in a class, Ms Ito (history), Ms Augone and, today, Mr. Masse sent text messaged to my husband looking for help in resolving the issue. Apparently, M.B. was refusing to do work in gym class and Mr. Masse is looking for insight in how to prompt M.B. back to focusing on his work. My husband often does not see personal texts until later in the evening due to work."

68.     On April 15, 2021, the IEP team convened for M.B.'s annual review. Teacher input included the following in Personal Development: "When M.B. perceives himself to be unable to do so he exhibits maladaptive behavior such as: avoidance and withdrawal during instructional time... Every class since returning to in-person has resulted in additional staff entering the room to assist with behaviors".

69.     At the April 15, 2021 IEP meeting, teacher imput included the following in academics including, English: "M.B. requires teacher support and prompting to initiate and remain on task"; History: "M.B. is frequently off task... On one occasion, behavior assistance was requested due to M.B. kickin the teacher's desk, pushing the teacher's desk, and hitting the teacher's plexiglass shield"; and Science: "His behavior is variable. When he is ready and available for learning, he will make connections, conduct himself in a positive manner, and contribute to the classroom learning environment. Sometimes, his behavior impacts his learning due to disruptive tendencies to include: blurting out in class, leaving his seat and space, work refusal, and exhibiting various attention seeking behaviors."

70.     The school-based team members reported M.B. was averaging 15 work refusals per 20-minute period.  The school-based team agreed to collect additional data to be reviewed when the team could reconvene.

71.     On June 4 and 17, 2021, the IEP team convened to discuss M.B.'s placement. FCPS recommended the Burke Center despite the parents' concern that Burke did not have the intensive reading program and interventions to meet M.B.'s needs.

72.     Although Burke was initiating training in the Wilson reading intervention during summer 2021, teachers would lack experience in implementing the program during M.B.'s first year. Instead, Corrective Reading would have been used, which had already failed with M.B.

73.     Several profressionals had recommended the use of Orton Gillingham with M.B. FCPS was no long training teachers in the Orton Gillingham program.  Therefore, M.B. would not have had appropriate access to Wilson or Orton Gillingham at Burke.

74.     Because Burke only proceeds through 8th grade, M.B. would have been required to transfer out of Burke after one year.  It was not clear what reading program would be avalibale at the high school level.

75.     The Phillips School is a non-public day school that provides highly individualized learning environments with small classes and specially trained staff. Phillips has experienced Wilson trained teachers, led by a Level 1 certified teacher. Phillips also continues through high school, which would allow M.B. to have a continuity of instruction and reading intervention throughout high school to address the gaps in his education.

76.     The parents disagreed with the FCPS IEP and proposed placement at Burke, and provided notice of their intent to place him unilateraly at the Phillips School.

77.     On July 8, 2021, S.B. emailed her consent for evaluations to Ms. Tracy Price and requested that the Summer Clinic complete the evaluations. Ms. Price replied, "Thank you for returning the Notice and Consent for Evaluation. I will forward it to Summer Clinic, however, I can't guarantee that they will do the evaluations."

78.     On August 4, 2021, M.B. received a Speech and Language evaluation. On the CELF-5, M.B. scored: Core Language Score 76, 5th percentile; Formulated Sentences 9, 37th

percentile; Recalling Sentences 1, $0.1^{st}$ percentile; Understanding Spoken Paragraphs 7, 16th percentile; Semantic Relationships 7, 16th percentile. On the Peabody Picture Vocabulary Test (PPVT-5), M.B. scored in the 13th percentile, below expected range for his age.

79.     The Speech and Language evaluator summarized that, "Based on formal and informal assessment results, it appears that M.B. continues to exhibit an oral language disorder characterized by organizational pragmatic language and receptive word level semantic weaknesses. M.B.'s performance indicated oral language discrepancies with high effort level to achieve average scores for expressive tasks with visual cues. M.B.'s oral language formulation skills decreased in organization without a visual. M.B.'s pragmatic language skills were scattered. Although he understands the rules of using language, he demonstrated inconsistent use in structured tasks. Such problems may have a direct impact on M.B.'s performance in the classroom, especially with communicating learned knowledge and interacting with peers in a social context."

80.     On August 5, 2021, FCPS attempted a Psychological evaluation, however the evaluation was not able to be completed. The evaluator noted, "M.B. demonstrated low frustration tolerance on any task that required mental stamina and struggled to remain seated for the evaluation after 20 minutes."

81.     On September 10, 2021, the IEP team convened and FCPS requested that additional information from the Phillips School be provided.

82.     On September 22, and 27, 2021, Ms. Shannon Quinn, Speech and Language Pathologist at the Phillips School administered the Word Identification and Spelling Test (WIST). M.B. scored as follows: Word Identification 76, 5th percentile (Poor, Grade Equivalent (GE) 5.3);

Spelling 65, 1st percentile (Very Poor, GE <5); Sound-Symbol Knowledge 65, 1st percentile (Very Poor, GE <5); and Fundamental Literacy Ability Index 67, 1st percentile (Very Poor, GE <5).

83.     The Phillips School  IEP for M.B., dated October 27, 2021, documented that M.B. requires 1:1 support to complete assignments and was benefitting from the private separate day school. For related services, in addition to thirty (30) minutes weekly of Speech and Language, the IEP called for an additional thirty (30) minutes weekly of direct counseling services to address social skills and managing emotions.

84.     M.B.'s teacher at Phillips identified that a fear of failure leads to his work avoidance. Classroom staff were able to move M.B.'s desk directly next to staff for academic support and behavior prompting to better address M.B.'s fears and to help him build confidence.

85.     The Phillips IEP included goals and objectives in the areas of social skills, coping skills, reading comprehension, reading fluency, reading (decoding), spelling (encoding), writing, math computation, behavior, speech and language, and social skills.

86.     On November 4, 2021, the FCPS IEP team convened. The team had reviewed the assessment results, observation from Phillips School, and previous school evaluation data and determined that no changes were necessary to their current propsed goals on the FCPS IEP.  The meeting notes document that "The Herndon Middle School team feels M.B. was making incremental progress in behavior in the CSS program in the 2020-2021 school year."

87.     At the November 4, 2021 IEP meeting, FCPS staff shared the behavior program offered at Burke.

88.     Staff from Phillips School attended the meeting and also shared how their program was working for M.B.  Phillips staff shared that M.B. required extra support, explicit instruction

in social emotional strategies, and growth mindset. Phillips School shared M.B. really wants to make friends but lacks skills to develop those relationships.

89.     The IEP team agreed to add a social skills goal to improve interactions with others and a coping strategies goal for emotional regulation, as well as counseling services of two (2) hours per month as a related service.

90.     This was the first time FCPS had recommended counseling services for M.B., despite the fact that M.B. had experienced three years of excalating behaviors and multiple assessments noting concerns.

91.     The FCPS IEP team agreed that M.B. required a reduced student-to-teacher ratio but did not agree with Phillips that he required one-on-one support. FCPS proposed 29 hours weekly of "Emotional Disability" specialized instruction outside of the general education setting, 2 hours of counseling monthly, and 2 hours monthly of speech and language services.

92.     M.B. does not have an Emotional Disbility.

93.     The parents disagreed with the FCPS proposal and continued the notice of unilateral placement at the Phillips School.

94.     M.B. continues to make significant progress at Phillips School.

95.     The parents filed a due process appeal on January 28, 2022 appealing the FCPS IEPs and placements for the 2019-2020, 2020-2021 and 2021-2022 school years.  The due process hearing was held virtually on March 9, 10, 11, 14, 23, 24, and 25.

96.     The parents presented evidence and testimony from multiple experts to demonstrate the failure of FCPS to provide M.B. with a FAPE.  Those experts included, W. Todd Lanier, an

expert in Educational Assessment and Diagnoses of Students with Dyslexia; A. Pressel, an expert in Dyslexia, Reading Intervention, Special Educaiton and a Reading Specialist; and Dr. Paul Livelli, an expert in Special Education, School Administration, ADHD, and Dyslexia.

97.     The Hearing Officer issued her decision on May 17, 2022.

98.     The Hearing Officer improperly concluded that the parents did not meet their burden of proof and found that the FCPS proposed IEPs and placements were reasonably calculated for M.B. to make appropriate educational progress for the 2019-2020, 2020-2021, and 2021-2022 school years.

99.     The Hearing Officer ignored evidence and testimony presented by the parents and their experts that showed that M.B. failed to make progress to meet his unique needs during the 2019-2020 school year in the areas of reading, math, writing and social/emotional functioning.

100.    Without appropriate explanation, the Hearing Offcier failed to recognized that M.B.'s placement in a self-contained setting with no "same aged" peers during the 2019-2020 school year was inappropriate.

101.    The Hearing Officer inappropriately used the COVID shutdown as an excuse for the FCPS failure to meet M.B.'s behavioral needs during the 2019-2020 schoo year and its failure to provide appropriate ESY services.

102.    The Hearing Officer ignored evidence presented by the parents that showed that M.B. failed to make progress to meet his unique needs during the 2020-2021 school year in the aeras of reading, math, writing and social/emotional functioning.

103.    The Hearing Officer erred in excusing the teachers' failure to implement the math, reading and writing interventions and programs with fidelity.

104.    For the math internvetion, the Hearing Officer applied the incorrect standard, finding instead that the teacher did the "best that he could" given the nature of virtual instruction.

105.    The Hearing Officer applied an erroneous legal standard in finding that making "slow progress" was appropriate under the IDEA because of his M.B.'s disability and placement in a special education classroom.

106.    The Hearing Officer ignored M.B.'s failure to master IEP goals, which demonstates a clear lack of progress, instead finding that making progress toward the goals year after year is appropriate.

107.    The Hearing Officer failed to acknowledge that at least one IEP math goal had been repeated on M.B.'s IEP for multiple years.

108.    The Hearing Officer erred in failing to give weight to the parents' experts' testimony and opinions based on her conclusion that the experts had insufficient involvement in M.B.'s education.

109.    The Hearing Officer erred in ignoring the results of the standardized testing, showing a lack of progress.

110.    The Hearing Officer erred in finding that the proposal for the 2021-2022 school year for M.B. to attend Burke, the public day school, was appropriate in light of his circumstances.

111.    The Hearing Officer erred in failing to recognize the procedural violation that occurred when the FCPS IEP team predetermining M.B.'s placement for the 2021-2022 school year.

112.    The Hearing Officer erred in finding Phillips inappropriate.

113.    The Hearing Officer's Decision contains multiple errors of fact and law.

114.    Many of the Hearing Officer's findings of fact are not regularly made.

115.    The Hearing Officer applied incorrect legal standards in reaching her Decision.

116.    The parents are aggrieved by the Hearing Officer's Decision.

117.    The parents have exhausted their administrative remedies.

## COUNT I

### (Failure to provide a Free Appropriate Public Education)

118.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 116.

119.    Defendant's failure to provide M.B. with a Free Appropriate Public Education violates plaintiffs' rights under the IDEA and Virginia law.

## COUNT II

### (Failure to Offer Appropriate Program and Placement)

120.     Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 119.

121.    The failure of the Hearing Officer to order defendant to reimburse and place and fund M.B. in an appropriate program and placement violates the IDEA and Virginia law.

## COUNT III

### (Failure of the Hearing Officer to Render a Proper Decision)

122.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 121.

123.    The Hearing Officer committed error and violated plaintiffs' due process rights under the IDEA and Virginia law by failing to render a proper decision based on an accurate and impartial understanding of the facts.

124.     The Hearing Officer committed error and violated the plaintiffs' due process rights under the IDEA and Virginia law by failing to apply correct legal standards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.     Issue judgment for plaintiffs and against defendant;

2.     Issue declaratory relief that defendant violated plaintiffs' rights under applicable law;

3.     Issue injunctive relief, vacating the Decision of the Hearing Officer and ordering defendants to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling M.B. at The Phillips School from the beginning of the 2021-2022 school year to the present;

4.     Order defendant to place and fund M.B. at the Phillips School and declare it to be her current educational placement under the IDEA;

5.     Order defendant to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.     Award any other relief that this Court deems just.

Respectfully Submitted,

        /s/  Paula A. Rosenstock
Paula A. Rosenstock VA Bar #65787
M.B. J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
(301) 657-3843 (fax)
Paula.Rosenstock@lawforchildren.com
Attorney for Plaintiff