IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| M.B., et al., | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | )    **Case No. 1:22-cv-930** |
| **FAIRFAX COUNTY SCHOOL BOARD,** | ) |
|     Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

M.B. and his parents J.B. and S.B. as next friends (collectively, "Plaintiffs"), bring this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, challenging a Hearing Officer's decision that Defendant Fairfax County Public Schools provided M.B. with a free appropriate public education ("FAPE"), as required by the IDEA. Specifically, Plaintiffs seek reimbursement for tuition costs incurred in sending M.B. to a private day facility during the 2021–22 school year, as well as an Order directing Fairfax County Public Schools ("FCPS") to place and fund M.B. at the private day facility going forward.

After a seven-day hearing with testimony from eighteen witnesses, the Hearing Officer denied Plaintiffs' request for reimbursement and found that private school placement for M.B. was unnecessary because the public special education that Defendant provided to M.B. satisfied the IDEA's requirements. This matter is now before the Court on the parties' cross motions for judgment on the administrative record,[1] which have been fully briefed and argued orally at a

---

[1] The parties correctly agree that pursuant to Fourth Circuit precedent, their IDEA dispute is appropriately resolved by cross motions for judgment on the administrative record rather than cross motions for summary judgment. *See Kirkpatrick v. Lenoir Cty. Bd. of Educ.*, 216 F.3d 380, 385 n.4 (4th Cir. 2000) ("IDEA actions are original civil actions that should typically be disposed of by motions for judgment.")

hearing on May 25, 2023. Accordingly, the motions are now ripe for disposition. A careful review of the record makes clear that the Hearing Officer correctly determined that Defendant provided M.B. with a free appropriate public education for the time period at issue, including by providing M.B. with Individualized Education Programs ("IEPs") reasonably calculated to enable M.B. to make progress in light of his circumstances. Thus, Defendant's motion must be granted and Plaintiffs' motion to the contrary must be denied.

## I.

As a preliminary matter, it is important to clarify that although the record in this case includes evidence going as far back as the 2013–14 school year, the only school year at issue in this dispute is the 2021–22 school year, during which M.B.'s parents decided to send M.B. to a private school and for which the parents seek reimbursement from Defendant. Indeed, at oral argument, Plaintiffs agreed that M.B.'s eighth grade year—the 2021–22 school year—is the only year at issue in this case, and the Complaint only seeks reimbursement "for the tuition expenses and costs incurred in enrolling M.B. at Phillips School from the beginning of the 2021–2022 school year to the present." Compl., Dkt. 5 at 25. Yet the Hearing Officer appropriately considered and made findings regarding school years 2018–19, 2019–20, and 2020–21, because the years 2018–21 provide context for the decisions made during the 2021–22 school year. Accordingly, findings of fact related to those schools years are also relevant here.

Given this, the following findings of facts are derived from a review of the entire administrative record in this case and give due weight to the regularly made findings of the Hearing Officer following a seven-day hearing, which findings are supported by the preponderance of the evidence.

### Kindergarten through Fourth Grade

- During the 2012–13 school year, while attending kindergarten at a private school, M.B. was diagnosed by a clinical psychologist as suffering from Attention Deficit Hyperactive Disorder ("ADHD"). AR 1 at 8.[2] In the report, the psychologist concludes, among other things, that M.B. suffers from dyslexia. *Id.* Based on this evaluation, in 2013 FCPS found M.B. eligible for special education. AR 14 at 1.

- M.B. repeated kindergarten in the FCPS system in 2013–14. M.B. then attended a private school for students with learning disabilities for first and second grade. He was then homeschooled for two years for his third and fourth grade. AR 14 at 1.

### Fifth Grade (School Year 2018–19)

- In 2018, M.B.'s parents determined that M.B. needed more assistance in reading than the parents could provide in homeschooling, so M.B.'s parents enrolled him in FCPS at Sunrise Valley Elementary School for fifth grade. FCPS reevaluated M.B. and determined that he continued to be eligible for special education due to his ADHD diagnosis. AR 23 at 1; 180 at 193.

- The FCPS IEP team convened and developed an IEP for M.B. for the 2018–19 school year. The IEP provided M.B. with 13.25 hours per week of special education. M.B.'s parents agreed to the IEP for the 2018–19 school year. AR 24 at 27.

### Sixth Grade (School Year 2019–20)

- M.B. also attended Sunrise Valley Elementary public school for sixth grade. FCPS developed a new IEP for M.B.'s sixth grade year, which provided an increase in special education instruction from 13.25 hours per week to 19 hours per week. AR 31 at 29.

- During the meeting to develop the IEP for M.B.'s sixth grade year, M.B.'s parents requested that M.B. be placed in a more restrictive educational setting called a Comprehensive Services Site ("CSS"). The FCPS IEP team declined the parents' request because the IEP team determined that M.B. could be appropriately educated at Sunrise Valley Elementary, where he would continue to participate in class with his general education peers for portions of the school day. M.B.'s parents then agreed to the IEP for M.B.'s sixth-grade year. AR 180 at 239, 241.

- At the beginning of M.B.'s sixth grade year, his IEP indicated that M.B. could read at a beginning third grade level. AR 31 at 8. For this reason, M.B. participated in a corrective reading program. M.B. also participated in a behavioral program designed to motivate M.B. to participate in class. AR 183 at 67–70.

---

[2] Citations to the Administrative Record are indicated as "AR" followed by the exhibit number and page number within that exhibit.

- On March 15, 2020, during M.B.'s sixth grade year, all public schools in Virginia closed pursuant to the Governor's order during the COVID-19 pandemic. AR 183 at 171.

- Due to school closings during the pandemic, FCPS developed a Temporary Learning Plan ("TLP") for M.B. to help provide M.B. with a continuity of education and abate any regression by M.B. during the school closure. The TLP contained individualized goals, accommodations, and services for M.B. The TLP was voluntary and not compelled by attendance requirements, and no new grades were provided for this period. AR 186 at 172, 176–77.

- M.B.'s IEP reports from the 2019–20 school year demonstrate that M.B. made progress during sixth grade. Specifically, M.B. received a final progress code of "4" on all of his reading goals, which denotes that M.B. made significant progress.[3] For example, M.B. began sixth grade reading at a beginning third grade level, but by April of his sixth grade year, M.B. was reading at a mid-third grade level.[4] M.B. also progressed in writing and math. Overall, out of his 13 goals, M.B. made sufficient progress towards achieving five goals and some progress achieving six goals. For this reason, the Hearing Officer found that during his sixth-grade year, M.B. made progress towards achieving his IEP goals, which was meaningful progress given M.B.'s circumstances. AR 124; 286 at 40.

- M.B.'s sixth grade report card also demonstrates that M.B. made progress in the sixth grade. FCPS report cards use a numbering system from 1 through 4.[5] On M.B.'s fifth grade report card, he received mostly "2s" and even several "1s," whereas on M.B.'s sixth grade report card, he received mostly "3s" and "4s." AR 12 at 1; 35 at 1.

### Seventh Grade (School Year 2020–21)

- In preparation for M.B.'s seventh grade year, the IEP team convened in January, April, and May 2020 to discuss goals, services, and placement for M.B., and to plan for M.B.'s transition from elementary school to middle school. AR 42, 47.

- Due to increased behavioral concerns,[6] the IEP team concluded that M.B. needed a greater level of service than that available at Sunrise Valley Elementary, where M.B. had attended fifth and sixth grade. The IEP team considered three options for M.B.'s seventh

---

[3] On the FCPS IEP reports, a "2" indicates that the child has not yet demonstrated progress toward achieving the goal, a "3" denotes that the child has demonstrated some progress, and a "4" indicates that the child is making sufficient progress toward achieving the goal within the duration of the IEP.

[4] M.B. also improved in his reading speed: his sixth grade IEP progress reports reflect that in June 2019, M.B. could read 62 words per minute with 96% accuracy, but by April 2020, M.B. could read 94 words per minute with 99% accuracy. AR 124 at 3.

[5] On FCPS report cards, "4" equates to consistently demonstrating concepts and skills, a "3" equates to usually demonstrating concepts and skills, a "2" equates to sometimes demonstrating concepts and skills, and a "1" equates to seldom demonstrating concepts and skills. AR 286 at 41.

[6] For example, in February 2020, M.B. was suspended twice for refusing to follow classroom directions, grabbing a staff member, leaving the building, attempting to hit another student with his recorder, elbowing a staff member, throwing materials, and kicking an administrator. AR 43 at 1; 47 at 30.

grade placement: (i) a CSS program at Herndon Middle School, a public school that has lower student/teacher ratios and additional support for special education students while still enabling integration with general educational peers; (ii) Burke School, a separate public day school only for special education students which provides the highest level of support available for students within FCPS; and (iii) a private day school. AR 184 at 31–39; 185 at 187.

- Ultimately, FCPS decided to place M.B. in the CSS program at Herndon Middle School because the CSS program offered M.B. necessary support while allowing integration with general education peers. The CSS program also provided access to counseling resources and clinicians. Moreover, FCPS concluded that Burke School or private placement would be too restrictive for M.B., as neither would allow integration with general education peers. AR 47 at 46; 184 at 41.

- Due to the COVID-19 pandemic, M.B. started his seventh-grade year at Herndon Middle School in synchronous virtual format, meaning that students participated in live online instruction with teachers and classmates. Given this, FCPS modified M.B.'s IEP to reflect the change to virtual learning. This lasted until March 2021 when M.B. returned to school for in-person learning. AR 184 at 22–24; AR 47; AR 180 at 292–93.

- In order to address loss of instruction during the COVID-19 school closure, FCPS offered M.B. recovery services in math for 21 weeks, and M.B.'s progress in math improved. FCPS did not offer M.B. recovery services in reading because FCPS determined that M.B. was already receiving adequate reading instruction in two English classes. Moreover, the school members noted that (i) recovery services were offered after school, (ii) M.B. was already receiving after school math recovery, and (iii) M.B.'s behavior problems were more prevalent in the afternoon when he was tired. For these reasons, the school members decided that M.B. would be too overwhelmed if after-school reading recovery services were added on top of math recovery services. AR 286 at 51.

- M.B. displayed educational progress during his seventh-grade school year. His IEP progress reports from the school year demonstrate that M.B. either mastered or made "sufficient progress" on many of his goals and made "some progress" on most of the rest. AR 57, 286 at 45–49. For example, in reading, at the end of the first quarter of M.B.'s seventh-grade year, M.B. could read fourth grade text at 70 words per minute; by end of the academic year, M.B. could read fifth grade text at 80 words per minute with 98% accuracy. AR 57 at 1; 286 at 23. Moreover, M.B.'s teachers testified that he made academic improvement in many areas.[7]

---

[7] *See, e.g.*, AR 183 at 249 ("[M.B.] was progressing and needing accelerated activities rather than repetitive activities."); AR 183 at 280–82 (in virtual education, M.B. "was able to demonstrate that he was understanding the concepts that we were teaching and move forward."); AR 185 at 281 (in the reading program, "I saw progress from him and that is what we were looking for."); AR 183 at 350–51 ("I think [M.B.] made progress . . . based off a lot of quiz and assessment scores that I was seeing last year . . . he was doing very well on them."); AR 185 at 222 ("[M.B.] was a high flier in history class."); AR 185 at 228 ("I remember feeling that there was a—a pretty impressive change in his behavior.").

- M.B.'s seventh grade report card showed passing grades of A's and B's, and Herndon Middle School CSS staff testified that these grades were based on numerous graded assignments and not inflated. AR 139 at 1; AR 185 at 275–76.

**Eighth Grade (School Year 2021–22)**

- The FCPS IEP team met three times in April and June 2021 to develop a plan for M.B.'s eighth-grade school year. The team proposed 29.5 hours a week of special education services and 2 hours per month of speech language services, which meant that M.B. would be in a special education setting full time. The IEP team also developed a "Behavioral Intervention Plan" to address behavioral concerns, including M.B.'s history of refusing to comply with classroom directions. AR 184 at 77; AR 63 at 38, 41.

- During the June 17, 2021 IEP meeting, the IEP team discussed M.B.'s placement for his eighth-grade year. After much consideration of M.B.'s needs, FCPS proposed placement at Burke School, a small, public, self-contained special education school. FCPS proposed Burke School because of the intensive services offered there. AR 184 at 82–85; AR 286 at 32.

- Burke School differs from the CSS program at Herndon, where M.B. attended seventh grade, because Burke School is more restrictive and offers more services for special education students. Burke School is more restrictive than the CSS program because, unlike the CSS program at Herndon, only special education students attend Burke School and the school is housed in a standalone building. Class sizes are small and average between two to five students. All teachers at Burke School are certified special education teachers except those providing instruction in art and music. Burke School also has clinical staff consisting of two social workers, two psychologists, and a counselor. AR 185 at 21–31.

- Burke School also offers behavioral supports for students, including by pairing every teacher with a team consisting of a social worker, a psychologist, and a coaching resource teacher. Each teacher meets with this team in order to discuss each student's progress and provide support to the students in the teacher's class. The team is present in the teacher's class each day during instruction. Staff also accompany students throughout the day, and sections within the building are locked during the school day to prevent students from meandering to parts of the building they are not supposed to enter. AR 185 at 32–40.

- Burke School also offers academic supports including intensive interventions in math, English, and reading. AR 185 at 45–49.

- In addition to these supports, Burke School also offers an extended school year, which would have allowed M.B. to start at Burke School in advance of the regular school year. FCPS determined this would be desirable for M.B. because it would provide a transition period for M.B. in advance of the traditional school year to give M.B. additional time to adjust to the staff at Burke School. AR 185 at 184.

6

- For all of these reasons, the FCPS members of M.B.'s IEP team determined that placement was appropriate for M.B. at Burke School. Despite this, during the June 17, 2021 IEP meeting, M.B.'s parents informed FCPS that they did not agree with placement at Burke School and that they had instead unilaterally decided to place M.B. at Phillips School, a private school. M.B.'s parents also informed FCPS that they would be seeking reimbursement from FCPS for the cost of sending M.B. to the private Phillips School. AR 63 at 25.

- Phillips School differs significantly from Burke School. Students enrolled at Phillips School require a restrictive environment because their behaviors are characterized as aggressive, volatile, destructive, and dangerous. As a result, unlike at Burke School, students at Phillips School are placed in seclusion rooms to protect staff and other students. AR 182 at 106–10; 286 at 35.

- FCPS determined that Phillips School would not be an appropriate placement for M.B. because M.B.'s behaviors did not rise to the level of those typically displayed by students at Phillips School. AR 184 at 287–88.

- Moreover, as a representative from FCPS testified, FCPS has placed students at Phillips School when appropriate, but Phillips School would be overly restrictive for M.B. because M.B. does not require seclusion, unlike the students at Phillips School. Furthermore, FCPS determined that Phillips School was not an appropriate placement because Phillips School does not specialize in specialized reading programs. AR 184 at 281–86, 290, 295.

- Despite FCPS's determination that Phillips School was not an appropriate placement, M.B.'s parents sent M.B. to Phillips School for eighth grade. There, M.B. received mostly C's and B's on his first and second quarter grades, but did receive A's in his health and art classes. M.B. was also involved in a "serious incident" in November 2021 at Phillips School.[8] M.B. has not been using a specialized reading program at Phillips School, and in fact has refused to engage with reading materials when staff at Phillips School attempted to implement a specialized reading program with M.B. AR 182 at 132; 164; 159 at 2; 184 at 292–93; 182 at 178–79.

### Administrative Proceedings

- On January 28, 2022, M.B.'s parents filed a complaint requesting an administrative due process hearing pursuant to the IDEA given the parents' disagreement with FCPS's placement of M.B. at Burke School and the parents' request for reimbursement for the costs of sending M.B. to Phillips School. The hearing took place over seven days in March 2022. As part of the hearing, the Hearing Officer received 198 exhibits and heard testimony from eighteen witnesses which comprises 2,300 pages of transcript. The

---

[8] AR 159-2. Specifically, M.B. "showed his middle finger to a peer," the peer pushed M.B. to the ground, and M.B. then attempted to approach the peer after the peer walked away. *Id.*

Hearing Officer also received post-hearing briefs from the parties. AR 261–62; 180–86; 281–82.

- On May 24, 2022, the Hearing Officer issued her final, 57-page decision which includes extensive findings of fact and conclusions of law. Specifically, as summarized below, the Hearing Officer made the following conclusions:

    1. **Sixth Grade (2019–20)**

        a. During M.B.'s sixth-grade year, FCPS provided sufficient services and special education so that M.B. could make progress toward meeting his IEP goals and objectives. Specifically, M.B.'s sixth-grade IEP reports demonstrate progress and advancement because M.B. showed progress toward achieving eleven out of thirteen IEP goals. M.B.'s sixth-grade report card also demonstrates progress.

        b. Once schools closed due to the pandemic, FCPS offered M.B. an appropriate temporary learning plan, or "TLP," which did not deny M.B. a FAPE. The TLP was based on M.B.'s unique circumstances rather than administrative convenience.

        c. Considering M.B.'s progress and FCPS's temporary learning plan as a response to the COVID-19 pandemic, FCPS did not deny M.B. a FAPE during the 2019–20 school year.

    2. **Seventh Grade (2020–21)**

        a. FCPS provided M.B. sufficient services and special education during M.B.'s seventh-grade year to enable M.B. to make progress toward meeting his IEP goals and objectives. M.B.'s IEP reports, assessments, and report cards demonstrate that M.B. made progress in math, writing, behavior, and reading.

        b. During school closures due to the pandemic, FCPS offered M.B. appropriate educational programming based on M.B.'s unique circumstances.

        c. After the pandemic, FCPS offered M.B. appropriate recovery services to address M.B.'s loss of instruction during the school closure. Specifically, FCPS offered M.B. recovery services in math for 21 weeks, and M.B.'s progress in math accelerated.

        d. Considering M.B.'s progress and FCPS's temporary learning plan as a response to the COVID-19 pandemic, FCPS did not deny M.B. a FAPE during the 2020–21 school year.

3. **Eighth Grade (2021–22)**

    a. FCPS developed appropriate IEPs for M.B.'s eighth grade year and offered M.B. sufficient services and special education so that M.B. could make progress toward meeting his IEP goals.

    b. FCPS appropriately placed M.B. at Burke School for his eighth-grade year because Burke School is the least restrictive environment that can provide the special education M.B. requires. This decision was made after careful deliberation and was based on M.B.'s unique circumstances; the placement was not made for administrative convenience.

    c. The parents' preferred placement, Phillips School, is not an appropriate placement for M.B. because students enrolled at Phillips School require a more restrictive environment due to aggressive, destructive, and dangerous behaviors, and M.B.'s behavior problems do not rise to the level of those routinely displayed by students at Phillips School. Moreover, Phillips School uses seclusion rooms to protect staff members, which is unnecessary in M.B.'s case. Thus, Phillips School is an overly restrictive environment for M.B.

    d. Given the appropriate IEPs and proposed placement at Burke School, FCPS did not deny M.B. a FAPE during the 2021–22 school year.

AR 286 at 39–59.

Following the Hearing Officer's decision, M.B.'s parents, by counsel, filed this action on August 15, 2022, seeking to reverse the Hearing Officer's decision and alleging that FCPS had failed to provide M.B. with a FAPE, as required by the IDEA. Plaintiffs argue that the Hearing Officer plainly erred in her decision in favor of FCPS and accordingly Plaintiffs request tuition reimbursement for M.B.'s placement at Phillips School for the 2021–22 school year and funding for M.B.'s placement at Phillips School going forward. On March 8, 2023, the parties filed the cross motions for judgment on the administrative record that are currently at issue. For the reasons stated below, FCPS's motion must be granted and Plaintiffs' motion must be denied.

## II.

Analysis of Plaintiffs' IDEA claim properly begins with an overview of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* The IDEA was enacted to "throw open the doors of public education" and help students with disabilities who had previously been "either completely ignored or improperly serviced by American public schools." *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 571 (4th Cir. 2018). The IDEA requires that states, in return for federal funding, ensure that every child with a disability has the opportunity to achieve a "free appropriate public education," also known as a "FAPE." *Id.* (quoting 20 U.S.C. § 1412(a)). A FAPE refers to "special education and related services" that are "(1) without charge, (2) meet the standards of the state educational agency, (3) include the appropriate level of education in the state involved and (4) are provided in conformity with an individualized education program ('IEP')." *K.I. v. Durham Pub. Schs. Bd. of Educ.*, 54 F.4th 779, 785 (4th Cir. 2022). The IEP is prepared by a team of teachers, school officials, and the student's parents, and it serves as the "primary vehicle for ensuring the student receives a FAPE." *Id.* To satisfy the IDEA, the school must offer an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

The IDEA "anticipates that parents and educators will not always agree," and for this reason, the statute "assigns several procedural rights to parents who oppose the content of their child's IEP." *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 856 (4th Cir. 2023). Parents may request a due process hearing before an impartial state or local educational agency, 20 U.S.C. § 1415(f)(1)(A), and if the parents disagree with the outcome of the state administrative proceeding, the parents may then sue in federal court as M.B.'s parents have done

here. *Id.* § 1415(i)(2)(A). Finally, if the reviewing court determines that the school failed to offer an appropriate IEP for the student and that private special education is necessary, the IDEA permits the court to "order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).

Actions under the IDEA are "independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes findings based on the preponderance of the evidence." *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 304 (4th Cir. 2005); 20 U.S.C. § 1415(i)(2)(B). The burden of proof is "properly placed upon the party seeking relief"; here, M.B. and his parents. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Fairfax Cty. Sch. Bd. v. Knight*, 261 F. App'x 606, 608 (4th Cir. 2008) ("The parents bear the burden of proving that an IEP was substantively deficient."). But district courts reviewing a Hearing Officer's decisions under the IDEA must employ a "modified de novo" standard, which requires "giving 'due weight' to the underlying administrative proceedings." *R.F. ex rel. E.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237, 244–45 (4th Cir. 2019) (quoting *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 323 (4th Cir. 2009)). Pursuant to this standard, as long as a Hearing Officer's findings are "regularly made," the district court must consider the findings "*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).[9] For this reason, the Fourth Circuit

---

[9] And if a district court disagrees with the Hearing Officer's regularly made factual findings, the district court must "explain how [the district court], despite the fact that [the district court] was reviewing a cold record, reached a conclusion completely contrary to that of the [Hearing Officer] who conducted the proceedings." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327 (4th Cir. 2004).

has emphasized that the IDEA's "mandate to reviewing courts is 'bounded'" in order to "reflect[] the respect that courts accord to primary fact-finders." *Bouabid*, 62 F.4th at 857 (quoting *Burke Cty. Bd. of Educ. v. Denton ex rel. Denton*, 895 F.2d 973, 981 (4th Cir. 1990)).

## III.

Plaintiffs first argue that the Hearing Officer's administrative findings are not entitled to deference because they were not regularly made. This argument plainly fails in light of the extensive administrative record. The Fourth Circuit has made clear that in determining whether a Hearing Officer's findings of fact were "regularly made" and therefore entitled to "due weight," reviewing courts should focus "on the *process* through which the findings were made." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty.*, 516 F.3d 254, 259 (4th Cir. 2008). In this respect, a hearing officer "who made factual determinations by 'flipping a coin' or 'throwing a dart,' for example, would obviously not be entitled to deference." *Bouabid*, 62 F.4th at 857 (quoting *J.P. ex rel. Peterson*, 516 F.3d at 259). In contrast, where the Hearing Officer "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way," the Fourth Circuit has concluded that the administrative findings are entitled to deference. *J.P. ex rel. Peterson*, 516 F.3d at 259.

These principles, applied here, clearly establish that the Hearing Officer's findings were "regularly made" and accordingly are entitled to "due weight." *Id.* The Hearing Officer conducted a lengthy, seven-day hearing during which she permitted the parents and the school board to call witnesses without restriction and to direct- and cross-examine the witnesses. Indeed, the testimony of the eighteen witnesses who testified during the hearing comprises roughly 2,300 pages of transcript. *See* AR 180–86. Moreover, it is clear from a review of the

transcript that the Hearing Officer was actively involved throughout the hearing, taking notes and asking her own questions of the witnesses.[10] The Hearing Officer also permitted parties to introduce exhibits, and the parties did so, submitting a total of 198 exhibits into the record—92 exhibits from FCPS and 86 exhibits from the parents. *See* Index of Record of Administrative Proceedings, AR 0 at 1–10. The Hearing Officer also permitted the parties to file post-hearing briefs. *See* AR 281–82.

After hearing all the evidence and receiving post-hearing briefs from the parties, the Hearing Officer issued a thorough 59-page decision detailing her findings and analysis. *See* AR 286. The Hearing Officer's detailed decision includes hundreds of citations to the transcript and exhibits. *See, e.g.*, AR 286 at 37–39, 50–51. Moreover, the Hearing Officer's decision made explicit findings as to the credibility of the witnesses and provided explanations for her decision to rely on certain witnesses over others.[11] In doing so, the Hearing Officer went above and beyond the IDEA's procedural requirements; as the Fourth Circuit has explained, a hearing officer in an IDEA case "need not 'explain in detail [her] reasons for accepting the testimony of one witness over that of another.'" *Bouabid*, 62 F.4th at 859 (quoting *Z.P. ex rel. R.P.*, 399 F.3d at 306); *see also J.P. ex rel. Peterson*, 516 F.3d at 262 ("[O]ur case law does not require an IDEA hearing officer to offer a detailed explanation of [her] credibility assessments."). The Hearing Officer clearly went well beyond what this Fourth Circuit caselaw requires. The record establishes that the Hearing Officer's active participation in the seven-day hearing, review of

---

[10] *See* AR 180 at 163–65; 181 at 136–39, 215, 315–17; 186 at 98–100, 159.

[11] *See, e.g.*, AR 286 at 9–10 (explaining that one witness was not credible because he "did not obtain any input from any of the school district's educators," "has not participated in any of the child's IEP meetings," and "is an advocate for parents and students and has testified numerous times on their behalf in due process hearings."); AR 286 at 50 ("The Hearing Officer gives little weight to this testimony as Expert A had no personal involvement in the child's education, she has never taught the child nor has she attended any IEP meetings involving the child.").

almost 200 exhibits, and exhaustive 59-page decision is a far cry from "flipping a coin" or "throwing a dart," which the Fourth Circuit has held is not appropriate. *Bouabid*, 62 F.4th at 857. Thus, because there is "nothing in this record to indicate sloppiness or indifference or the desire of a decisionmaker to simply [sic] rush out the door," Plaintiff's argument that the Hearing Officer's findings were not "regularly made" must be rejected. *Id.* at 858.

In conclusion, under Fourth Circuit precedent, the Hearing Officer's findings of fact were regularly made and are therefore entitled to due weight. Indeed, in these circumstances, the Fourth Circuit has cautioned that "[w]hen an ALJ's decision is grounded in procedural care," reviewing courts must "be especially deferential in their scrutiny." *Bouabid*, 62 F.4th at 858. Thus, because the Hearing Officer's findings are entitled to due weight, they are accepted here as *prima facie* correct. Moreover, the Hearing Officer's findings must be adopted here, as they are supported by a preponderance of the evidence in the record as a whole.

**IV.**

Seeking to avoid this conclusion, Plaintiffs argue that the Hearing Officer reached the wrong conclusion for four reasons: (i) the Hearing Officer failed to apply the proper FAPE standard under Supreme Court precedent; (ii) the Hearing Officer erred in excusing FCPS's response to the COVID-19 pandemic; (iii) the Hearing Officer improperly credited FCPS's witnesses while discrediting the testimony of the parents' expert witnesses; and (iv) the Hearing Officer erred in concluding that Burke School was an appropriate placement for M.B. rather than Phillips School. Each of these arguments fails.

**A.**

First, Plaintiffs argue that the Hearing Officer erred in concluding that FCPS provided M.B. a FAPE because the Hearing Officer applied the wrong standard under the Supreme

14

Court's decision in *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386 (2017). In *Endrew F.*, the Supreme Court explained that to pass muster under the IDEA, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and must be "appropriately ambitious in light of his circumstances." *Id.* at 399, 402. The Supreme Court also emphasized that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 399. According to Plaintiffs, the Hearing Officer misapplied this standard when she concluded that M.B. made academic progress during the school years at issue and that FCPS appropriately addressed M.B.'s behavior. Plaintiffs argue that the administrative record establishes that M.B. did not make meaningful progress and that FCPS failed to address M.B.'s behavioral issues.

Plaintiffs are incorrect; the Hearing Officer applied the correct standard under *Endrew F.*, and the administrative record supports the Hearing Officer's conclusions that FCPS developed IEPs "reasonably calculated" to enable M.B. to "make progress in light of [M.B.'s] circumstances," as required by Supreme Court precedent. *Endrew F.*, 580 U.S. at 399–400. Both the Supreme Court and the Fourth Circuit have emphasized that an IEP must be "reasonable," *not* "ideal." *Id.*; *A.B. by L.K. v. Smith*, 2023 WL 3533595, at *2 (4th Cir. May 18, 2023). Furthermore, the Fourth Circuit has made clear that a reviewing court may not "reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP." *Z.P. ex rel. R.P.*, 399 F.3d at 308. As long as the IEP is "reasonably calculated to enable the child to receive educational benefits," the hearing officer "cannot reject it because the officer believes that a different methodology would be better for the child." *Id.* Here, the Hearing Officer applied these principles and concluded, after reviewing hundreds of exhibits and seven days of testimony, that the evidence established that M.B. made appropriate progress as

demonstrated by his IEP progress reports and report cards. For example, in reading, M.B.'s sixth grade progress report showed that over the course of the school year, M.B. increased his ability to read fourth-grade-level text fluently and accurately. AR 124 at 3; AR 183 at 229. By the end of seventh grade, M.B.'s progress report indicated that he had improved from reading fourth-grade-level text to reading fifth-grade-level text at 80 words per minute with 98% accuracy, and could read sixth-grade-level text with at 90 words per minute at 99% accuracy. AR 57 at 1. Moreover, M.B.'s seventh grade reading teacher testified that M.B. made significant and meaningful progress towards his reading goals. AR 57 at 4. The Hearing Officer carefully reviewed this evidence and properly concluded that FCPS developed IEPs reasonably calculated to enable M.B. to make progress.

Attempting to refute the Hearing Officer's findings, Plaintiffs cite testimony and evidence from the parents' witnesses suggesting that M.B. did not make progress during the years preceding M.B.'s placement at Burke School. But this argument fails because FCPS presented numerous witnesses and exhibits demonstrating the opposite. It is therefore appropriate to defer to the Hearing Officer's factual determination about which of the competing witnesses to believe because the Hearing Officer, faced with contradictory testimony, had the advantage of hearing the witnesses and assessing their credibility. For this reason, the Fourth Circuit has held that district courts, which cannot see or hear the witnesses and instead only review a "cold record," should be hesitant to reverse a Hearing Officer's credibility determinations. *Lawson*, 354 F.3d at 327; *see also M.M. ex rel. D.M. v. DM Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 533 (4th Cir. 2002) ("In refusing to credit [the hearing officer's findings], and in conducting its own assessment of [the student's] IEP, the court elevated its judgment over that of the educators . . . The courts should, to the extent possible, defer to the considered rulings of the

16

administrative officers."). Accordingly, it is appropriate to adopt the Hearing Officer's factual determination here that M.B. made meaningful progress and that FCPS developed IEPs which were reasonably calculated to foster M.B.'s progress. Thus, Plaintiffs' argument that the Hearing Officer improperly concluded that M.B. made progress must be rejected.[12]

Plaintiffs also argue that the Hearing Officer incorrectly concluded that FCPS appropriately addressed M.B.'s significant behavior problems. This argument also fails. As the Hearing Officer correctly found, FCPS actively and proactively addressed M.B.'s behavioral problems, including by implementing, among other interventions, frequent behavioral data collection, daily behavioral support with checklists and charts, and individual support from a resource teacher.[13] Moreover, when the IEP team concluded that M.B.'s behavior problems were interfering with his progress in the general education setting, the IEP team placed M.B. in the Herndon CSS program, which provided M.B. with extra support including smaller classes, lower student-to-teacher ratios, a clinical team, support staff, and a system for daily data tracking and self-reflection. AR 184 at 31; AR 47 at 31. And once FCPS staff determined that M.B. needed even more intensive intervention than the Herndon CSS program provided, FCPS proposed placing M.B. at Burke School. AR 63 at 43. Accordingly, the Hearing Officer did not err in finding that FCPS's IEPs and placements during the school years at issue appropriately addressed M.B.'s behavioral needs.

---

[12] Plaintiffs also criticize FCPS's choice of reading programs for M.B., but those criticisms do not support Plaintiffs' IDEA claim because the Fourth Circuit has repeatedly emphasized that decisions about educational methodology are left to the discretion of school staff. *See Z.P. ex rel. R.P.*, 399 F.3d at 308 (holding that a reviewing court may not "reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP."); *Barnett v. Fairfax Cty. Sch. Bd.*, 927 F.2d 146, 151 (4th Cir. 1991) ("[W]hile a school system must offer a program which provides educational benefits, the choice of the particular educational methodology employed is left to the school system.").

[13] *See* AR 286 at 47; AR 47; AR 58; AR 63; AR 185 at 295–347.

**B.**

Plaintiffs next argue that the Hearing Officer erred in concluding that FCPS appropriately responded to the COVID-19 pandemic. Specifically, Plaintiffs argue that federal guidance made clear that school systems remained responsible for the provisions of FAPE under the IDEA even during the COVID-19 school shutdowns. In support, Plaintiffs cite a letter from the Department of Education's Office of Civil Rights, which was issued to Michelle Reid, superintendent of FCPS, in November 2022—six months *after* the administrative proceedings concluded in this case. *See Letter to Michelle Reid*, Office of Civil Rights Docket No. 11-21-5901 (Nov. 30, 2022) (hereinafter "OCR letter").[14] In the letter, the Office of Civil Rights reports the results of an investigation into FCPS to determine whether FCPS provided FAPE to students with disabilities during the COVID-19 pandemic. *Id.* The letter concludes that "during remote learning, [FCPS] failed or was unable to provide a FAPE to thousands of qualified students with disabilities." *Id.* at 1–2. Plaintiffs argue that judicial notice of this letter should be taken and that the letter establishes that the Hearing Officer improperly excused FCPS from its responsibilities to M.B. during the pandemic.

Plaintiffs' argument fails to persuade. To begin with, the substance of the OCR letter is entirely irrelevant, because it addresses FCPS's services during the 2019–20 and 2020–21 school years—years for which Plaintiffs do *not* seek reimbursement here. In this dispute, Plaintiffs only seek reimbursement for M.B.'s education at Phillips School for the 2021–22 school year, and the findings in the OCR letter do not address FCPS's provision of educational services during that time. Indeed, the OCR letter is limited to addressing FCPS's approach to virtual education during

---

[14] Available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11215901-a.pdf (accessed August 22, 2023) [https://perma.cc/893A-YGAU].

the pandemic, and by the 2021–22 school year, classes had resumed in person. Moreover, the OCR letter concerns a federal statute—the Rehabilitation Act—different from the one at issue in this case, and the letter involves different parties. Thus, the OCR letter is irrelevant and unhelpful to the parties' dispute here.

In any event, even if the OCR letter were relevant to the parties' dispute, it is not appropriate to take judicial notice of the letter. The letter is not part of the administrative record here—and indeed could not have been—because the letter was not issued until November 2022, six months after the administrative proceedings in this matter concluded when the Hearing Officer issued her decision in May 2022. Moreover, following Plaintiffs' filing of this action in federal court, the parties agreed not to submit any additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), and instead agreed to proceed strictly on the administrative record. *See* Joint Discovery Plan, Dkt. 11 at ¶ 4 ("Parties agree that they do not intend to submit additional evidence in this case pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)."). Now, Plaintiffs seek judicial notice of the letter. But judicial notice of the letter is not appropriate under Rule 201, Fed. R. Evid., which provides that a court can take judicial notice of facts which are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In no way are the findings in the OCR letter "not subject to reasonable dispute"; the OCR letter is a unilateral determination issued primarily through a paper inquiry. Under essentially similar circumstances, a Court in this district has correctly held that government agency investigations involving a paper review rather than a hearing process are inadmissible in IDEA hearings and federal actions because the findings in the investigations were arrived at through a process which does not have sufficient guarantees of reliability. *See M.S. v. Fairfax Cty. Sch. Bd.*, 2006 WL 2376202, at *3–4 (E.D. Va. Aug. 11, 2006) (Cacheris, J.)

(holding that state complaint letters of finding similar to the OCR letter here were properly excluded from evidence in an IDEA case).

Seeking to avoid this conclusion, Plaintiffs argue—for the first time in their reply brief—that Fourth Circuit precedent requires giving deference to the OCR letter. This argument must be rejected at the outset because it is well-established that an argument raised for the first time in a reply brief is waived and will not be considered. *See United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006). Moreover, the case on which Plaintiffs primarily rely is inapposite and thus unpersuasive here. *See D.L. v. Baltimore City Bd. of Sch. Comm'rs*, 706 F.3d 256 (4th Cir. 2013). In *D.L.*, the Fourth Circuit held that under the Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452 (1997), the court was obliged to a defer to an OCR opinion letter which was issued as "a direct clarification of [a] disputed regulation" in interpreting the ambiguous regulation. *D.L.*, 706 F.3d at 259. Here, however, no deference is owed to the OCR letter because in this case, unlike in *D.L.*, there is no ambiguous regulation at issue. Instead, this case only requires reviewing the Hearing Officer's factual findings that FCPS did not deny M.B. a FAPE by placing M.B. in Burke School instead of Phillips School. Moreover, unlike the letter at issue in *D.L.*, the OCR letter here explicitly states that "[t]his letter sets forth OCR's determination in an individual OCR investigation. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such." OCR letter at 22. Thus, the OCR letter—which involves different parties, a different statute, and different school years from those at issue here—has no bearing on the parties' dispute in this case.

Finally, it is clear that the Hearing Officer did not err in concluding that FCPS did not violate the IDEA during the COVID-19 pandemic. During the pandemic, FCPS implemented reasonable measures to ensure that M.B. continued to make progress under the circumstances

presented. For example, FCPS developed Temporary Learning Plans for students, including M.B., to promote voluntary participation in virtual learning activities while schools were closed. AR 186 at 175–76. Furthermore, after the initial school closures during the first months of the pandemic, FCPS offered recovery services to M.B. to address learning loss from the pandemic, including 21 weeks of recovery services for M.B.'s math goals. AR 58 at 28; 47; 61 at 27–29, 48, 53. Thus, the record reflects that FCPS devised and implemented measures during the COVID-19 pandemic designed to ensure that M.B. made reasonable progress given the difficult circumstances. Of course, it is impossible to overstate the impact of the pandemic and the hardships imposed on parents, students, teachers, and administrators alike by virtual learning. In this respect, the Fourth Circuit has explained that the IDEA is a "flexible" and "practical" standard which "must be applied in the day-to-day vortex of an up-and-down school year." *Bouabid*, 62 F.4th at 860. The record as a whole supports that the Hearing Officer properly concluded that FCPS acted reasonably during the pandemic. Thus, Plaintiffs' argument that the Hearing Officer improperly excused FCPS's failures during the pandemic must be rejected.

**C.**

Plaintiffs also argue that the Hearing Officer erred in crediting FCPS's witnesses while discrediting the parents' expert witnesses. Specifically, Plaintiffs argue that the Hearing Officer improperly gave no weight to the testimony of the parents' experts while finding that FCPS's witnesses—including M.B.'s teachers and school officials—were credible. This argument is directly contradicted by Fourth Circuit precedent, which establishes that in reviewing administrative findings under the IDEA, district courts must give due regard to the Hearing Officer's opportunity to hear in-person testimony and assess the weight and credibility of witnesses. *See, e.g.*, *Doyle*, 953 F.2d at 104–05 (holding that the district court improperly

21

discredited a witness where the hearing officer "who had seen and heard the same witness testify" credited the witnesses' testimony); *Lawson*, 354 F.3d at 328 (holding that the district court "wholly disregarded IDEA's mandate" in "its sweeping dismissal of the ALJ's findings" based on a review of the "cold record").

The Hearing Officer also made numerous, express assessments of the relative weight and credibility of the witnesses in order to explain her findings. For example, the Hearing Officer noted that one of the parents' witnesses was biased in his testimony and therefore not credible because he "is an advocate for parents and students and has testified numerous times on their behalf in due process hearings." AR 286 at 9–10. The Hearing Officer also explained that the testimony of the school district's witnesses carried more weight than that of the parents' witnesses because FCPS's witnesses were directly involved in M.B.'s education, whereas many of the parents' witnesses were never involved in educating M.B. *See, e.g.*, AR 286 at 9–10 (explaining that one witness was not credible because he "did not obtain any input from any of the school district's educators" and "has not participated in any of the child's IEP meetings"); AR 286 at 50 ("The Hearing Officer gives little weight to this testimony as Expert A had no personal involvement in the child's education, she has never taught the child nor has she attended any IEP meetings involving the child."). And these findings by the Hearing Officer are consistent with Fourth Circuit precedent, which establishes that there is a longstanding policy in IDEA cases to "afford great deference to the judgment of education professionals." *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014); *see also M.M. ex rel. D.M.*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators."); *Lawson*, 354 F.3d at 328 ("IDEA requires great deference to the views of the school system rather than those of even the most well-meaning

parents."). Here, the Hearing Officer was clearly justified in adopting the opinion of FCPS's educational professionals, and Plaintiffs' argument to the contrary fails.

**D.**

Finally, the Hearing Officer properly concluded that the public Burke School, not the private Phillips School, was the appropriate placement for M.B. and accordingly, Plaintiffs are not entitled to reimbursement for costs incurred in sending M.B. to Phillips School. Under the IDEA, schools must place students in the "least restrictive environment appropriate for the child's education" whenever possible. *R.F. ex rel. E.F.*, 919 F.3d at 247. Here, the Hearing Officer appropriately determined that Burke School provided extensive services, staffing, behavior supports, and academic supports to meet M.B.'s needs. Moreover, the Hearing Officer properly concluded that Phillips School was not an appropriate placement because the students placed at Phillips School had more serious behavior concerns than M.B., including "property destruction," "physical aggression," and threatening staff and students. AR 184 at 288. Furthermore, Phillips School secludes students to address safety concerns, which the Hearing Officer determined is a more restrictive approach than necessary for M.B. *See* AR 182 at 106–10; 286 at 35. It is therefore clear from the record that Burke School is the "least restrictive environment" for M.B.'s placement as required by the IDEA. *R.F. ex rel. E.F.*, 919 F.3d at 248. Thus, Plaintiffs' argument that FCPS should have placed M.B. at Phillips School instead of Burke School must be rejected.[15]

---

[15] M.B.'s parents also challenge Burke School as an inappropriate placement because of the reading and math programs and methodologies used there, but this argument fails in light of well-established Fourth Circuit precedent holding that a reviewing court may not "reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP." *Z.P. ex rel. R.P.*, 399 F.3d at 308; *see also Barnett*, 927 F.2d at 151 ("[W]hile a school system must offer a program which provides educational benefits, the choice of the particular educational methodology employed is left to the school system.").

**IV.**

In conclusion, the record in this case clearly demonstrates that the Hearing Officer's decision that Plaintiffs are not entitled to reimbursement for the costs incurred in sending M.B. to private school during the 2021–22 school year was regularly made and entitled to due weight. Moreover, an independent review of the extensive administrative record indicates that the Hearing Officer's findings of fact are clearly supported by a preponderance of the evidence in the record as a whole. Accordingly, the Hearing Officer's decision must be adopted here.

To be sure, Plaintiffs' arguments here are not without weight, and it is important to recognize that both M.B.'s parents and the school system want the best for M.B. and hope to see him succeed. It is also entirely appropriate for M.B.'s parents to emphasize that in their view, M.B. has done well at his new placement at the private Phillips School. Indeed, M.B.'s progress at Phillips School should be praised. M.B.'s parents have the right to send M.B. to any private school of the parents' choosing; they just do not have the right to receive reimbursement from the State for the cost of tuition when there is an appropriate placement for M.B. at a public school. Moreover, the Court recognizes the difficult undertaking of educating a child with special needs, especially during the COVID-19 pandemic, and applauds M.B's parents for vigorously advocating for their child during these proceedings.

M.B.'s success at Phillips School does not alter the IDEA's substantive requirement that school districts provide an IEP that gives the student an opportunity to make reasonable, not ideal, progress, and that school districts place students in the least restrictive environment possible. It is understandable that M.B.'s parents may take issue with these legal standards and wish that the IDEA demanded more of the school system, but the Hearing Officer properly determined that FCPS met the IDEA's requirements here. FCPS clearly provided M.B. with an

IEP and proposed placement that enabled M.B. to make reasonable progress in light of M.B.'s circumstances. Thus, Plaintiffs' request for reimbursement for M.B.'s 2021–22 school year at Phillips School and their request for funding for M.B.'s placement at Phillips School going forward must be denied. Accordingly, Defendant's motion for judgment on the administrative record must be granted, and Plaintiffs' motion to the contrary must be denied.

An appropriate Order will issue this same day. The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
August 22, 2023

T. S. Ellis, III
United States District Judge